1
2
3
4
5

James C. Shah
MILLER SHAH LLP
19712 MacArthur Blvd., Suite 222
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com

6
7

*Attorney for Plaintiff, the Plan,*
*and the Proposed Class*

8

9        **IN THE UNITED STATES DISTRICT COURT**

10        **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

11

12
13
14
15
16

NORMA VALENZUELA,
individually and as a representative
of a class of similarly situated
persons, on behalf of the
ADVANTAGE 401(k) SAVINGS
PLAN,

Case No.:

17                    Plaintiff,                    **CLASS ACTION COMPLAINT**

18                    v.

19
20
21
22
23
24
25

ADVANTAGE SALES &
MARKETING LLC; THE BOARD
OF DIRECTORS OF
ADVANTAGE SALES &
MARKETING LLC; THE
ADVANTAGE 401(K) SAVINGS
PLAN ADMINISTRATIVE
COMMITTEE; and DOES No. 1-20,
Whose Names Are Currently
Unknown,

26                    Defendants.

27

28

## I.   **INTRODUCTION**

1.      Plaintiff Norma Valenzuela ("Plaintiff"), on behalf of the Advantage 401(k) Savings Plan ("Plan") and a proposed Class ("Class") of participants and beneficiaries in the Plan, brings this action ("Action") under 29 U.S.C. § 1132 against Defendants Advantage Sales & Marketing LLC d/b/a Advantage Solutions ("Advantage"), the Board of Directors of Advantage Sales & Marketing LLC ("Board"), the Advantage 401(k) Savings Plan Administrative Committee ("Administrative Committee" or "Committee"), and Does No. 1-20, who are/were members of the Board and Committee or other fiduciaries of the Plan whose names are currently  unknown (collectively, "Defendants"), for breaches of their fiduciary duties under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq*., and related breaches of applicable law beginning six years prior to the date the action is filed and continuing to the date of judgment, or such earlier date that the Court determines is appropriate and just ("Class Period").

2.      As employer-provided defined benefit plans have become increasingly rare as a meaningful benefit offered and available to employees, defined contribution plans (*e.g.*, 401(k) plans) qualified as tax-deferred vehicles have become the primary form of retirement saving in the United States and, as a result, the country's *de facto* retirement system.  In traditional defined benefit retirement plans, a sponsoring employer typically promises a calculable benefit and assumes the risk with respect to high fees or underperformance of pension plan assets used to fund defined benefits, since such an employer is responsible for any shortfall in funding to provide the benefits promised.  In the context of defined contribution plans, however, *participants* bear the risk of high fees and investment underperformance.

3.      As of December 31, 2022, the Plan had 11,822 participants with account balances and assets totaling approximately $690 million, placing it in the top 0.1% of all U.S. defined contribution plans by plan participant count and top

0.2% of all U.S. defined contribution plans by total assets.[1]  Defined contribution plans with substantial assets, like the Plan, have significant bargaining power and can demand low-cost administrative and investment management services within the marketplace.  The market for defined contribution retirement plan services is well-established and can be competitive when fiduciaries of defined contribution retirement plans act in an informed and prudent fashion.

4.     Defendants maintain the Plan and are responsible for selecting, monitoring, and retaining the service providers that provide investment, recordkeeping, and other administrative services.  Defendants are fiduciaries under ERISA, and, as such, owe a series of duties to the Plan and its participants and beneficiaries, including obligations to act for the exclusive benefit of participants, select and maintain prudent and diverse investment options to offer through the Plan, and ensure that Plan expenses are fair and reasonable in relation to the services obtained.  These fiduciary duties are well understood to be the "highest known to the law." *Howard v. Shay*, 100 F.3d 1484, 1888 (9th Cir. 1996) (citing *Donovan v. Bierwirth*, 680 F.3d 263, 272 n.8 (2d Cir. 1982)).

5.     Defendants breached their fiduciary duties to the Plan.  As detailed below, Defendants: (1) caused unreasonable expenses to be charged to participants; and (2) failed to appropriately monitor the Plan's investments, resulting in the retention of unsuitable investments in the Plan instead of prudent alternative investments that were readily available at all times Defendants selected and retained the funds at issue and throughout the Class Period.  Since Defendants have discretion to select the investments made available to participants, as well as establish and/or negotiate the type and amount of fees owed by participants to cover

---

[1] BrightScope and Investment Company Institute, *The BrightScope/ICI Defined Contribution Plan Profile: A Close Look at 401(k) Plans, 2020*, September 2023, available at www.ici.org/files/2023/23-ppr-dcplan-profile-401k.pdf, accessed on January 24, 2024.

Plan administrative costs, Defendants' breaches directly caused the losses alleged herein.

6.      To remedy these fiduciary breaches and other violations of ERISA, Plaintiff brings this class action under Sections 404, 409, and 502 of ERISA, 29 U.S.C. §§ 1104, 1109, and 1132, to recover and obtain all losses resulting from each breach of fiduciary duty.  In addition, Plaintiff seeks such other equitable or remedial relief for the Plan and the proposed Class as the Court may deem appropriate and just under the circumstances.

7.      Plaintiff specifically seeks the following relief on behalf of the Plan and the Class:

        i.      A declaratory judgment holding that the acts of Defendants described herein violate ERISA and applicable law;

        ii.     A permanent injunction against Defendants prohibiting the practices described herein and affirmatively requiring them to act in the best interests of the Plan and its participants;

        iii.    Equitable, legal, or remedial relief for all losses and/or compensatory damages;

        iv.     Attorneys' fees, costs, and other recoverable expenses of litigation; and

        v.      Such other and additional legal or equitable relief that the Court deems appropriate and just under the circumstances.

## II.    THE PARTIES

8.      Plaintiff is a former employee of Advantage Sales & Marketing and participant in the Plan under 29 U.S.C. § 1002(7).  Plaintiff is a resident of Calexico, California.  During the Class Period, Plaintiff maintained an investment through the Plan in the Franklin Growth Fund and was subject to the excessive recordkeeping and administrative costs alleged below.

9.      Advantage Sales & Marketing is a sales, merchandising, and

marketing company headquartered in Irvine, California. Advantage is the Plan Sponsor.

10. The Board appointed "authorized representatives" of Advantage, including the Administrative Committee, as Plan fiduciaries. Does No. 1–10 are current and former members of the Board who are fiduciaries of the Plan under ERISA under 29 U.S.C. §§ 1002(21)(A) because each exercised discretionary authority to appoint and/or monitor the Administrative Committee, which had control over Plan management and/or authority or control over management or disposition of Plan assets.

11. The Administrative Committee is responsible for the general administration of the Plan and is a fiduciary under ERISA under 29 U.S.C. §§ 1002 and 1102. The Administrative Committee maintains its address at Advantage's company headquarters in Irvine, California. The Administrative Committee and its members are appointed by Advantage or its delegate to administer the Plan on Advantage's behalf. Does No. 11–20 are current and former members of the Administrative Committee and, by virtue of their membership, fiduciaries of the Plan or otherwise are fiduciaries of the Plan.

12. Plaintiff is currently unable to determine the membership of the Board and the Committee or the identities of the other fiduciaries of the Plan because, despite reasonable and diligent efforts, it appears that the membership of the Board and Committee or the identities of any other fiduciaries are not publicly available. As such, these Defendants are named Does as placeholders. As soon as practicable after their identities are discovered, Plaintiff will move, under Federal Rule of Civil Procedure 15, to amend this Complaint to name the members of the Board, members of the Administrative Committee, and other responsible individuals as Defendants.

### III.    <u>JURISDICTION AND VENUE</u>

13. Plaintiff seeks relief on behalf of the Plan pursuant to ERISA's civil

enforcement remedies with respect to fiduciaries and other interested parties and, specifically, under 29 U.S.C. § 1109 and U.S.C. § 1132.

14.     This Court has subject matter jurisdiction over the Action pursuant to 28 U.S.C. § 1331 because the Action arises under the laws of the United States.

15.     Venue is proper in this District pursuant to Section 502(e) of ERISA, 29 U.S.C. § 1332(e), and 28 U.S.C. § 1391 because Advantage's principal place of business is in this District and the Plan is administered in this District.  Further, a substantial part of the acts and omissions giving rise to the claims asserted herein occurred in this District.

16.     Plaintiff has standing to bring the Action because the assets attributable to her Plan account were invested in the investment alternative challenged in the action and she paid the excessive recordkeeping and administrative fees at issue during the Class Period.  Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), authorizes any participant, fiduciary, or the Secretary of Labor to bring suit as a representative of a plan, with any recovery necessarily flowing to a plan.  As explained herein, the Plan has suffered millions of dollars in losses due to Defendants' fiduciary breaches and remains vulnerable to continuing harm, all redressable by the Court.  And, although standing under Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2), is established by these Plan-wide injuries, Plaintiff and all Plan participants also suffered financial harm as a result of the Plan's imprudent investment options and were deprived of the opportunity to invest in prudent options and pay only reasonable recordkeeping and administrative fees, among other injuries.

## IV.   FACTUAL ALLEGATIONS

### A.   BACKGROUND AND PLAN STRUCTURE

17.     The Plan is a participant-directed 401(k) plan, meaning participants direct the investment of their contributions into various investment options offered by the Plan.  Each participant's account is credited with their participant

contributions, applicable employer matching contributions, any discretionary contributions, and earnings or losses thereon. The Plan pays expenses from Plan assets, and the majority of administrative expenses are paid by participants as a reduction of investment income. Each participant's account is charged with the amount of distributions taken and an allocation of administrative expenses. The investment options made available to Plan participants include various mutual funds and collective trust funds.

18.     Mutual funds are publicly traded investment vehicles consisting of a pool of monetary contributions collected from many investors for the purpose of investing in a portfolio of equities, bonds, and other securities. Mutual funds are operated by professional investment advisers, who, like the mutual funds, are registered with the U.S. Securities and Exchange Commission ("SEC"). Mutual funds are subject to SEC regulation and required to provide certain investment and financial disclosures and information in the form of a prospectus.

19.     Collective trusts are, in essence, mutual funds without the SEC regulation. Collective trusts fall under the regulatory purview of the Office of the Comptroller of the Currency or individual state banking departments. Collective trusts were first organized under state law in 1927 and were blamed for the market crash in 1929. As a result, collective trusts were severely restricted, giving rise to the more transparent and publicly traded mutual funds described above. Today, banks create collective trusts only for their trust clients and for employee benefit plans, like the Plan. Despite their historic lack of transparency, modern collective trust sponsors provide sufficient information for investors to make informed decisions about the merits of investing in collective trusts. The main advantage of opting for a collective trust rather than a mutual fund is the negotiability of the fees. Accordingly, large retirement plans are able to leverage their size for lower fees.

20.     During the Class Period, Plan assets were held in a trust by the Plan trustee, Principal Life Insurance Company ("Principal"). All investments and asset

allocations are performed through this trust instrument.

**B.    THE DEFINED CONTRIBUTION INDUSTRY**

21.    Failures by ERISA fiduciaries to monitor fees and costs for reasonableness, such as those identified herein, have stark financial consequences for retirees.  Every extra level of expenses imposed upon plan participants compounds over time and reduces the value of participants' investments available upon retirement.  Over time, even small differences in fees compound and can result in vast differences in the amount of a participant's savings available at retirement.  As the Supreme Court has explained, "[e]xpenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan." *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015).

22.    The impact of excessive fees on a plan's employees' and retirees' retirement assets is dramatic.  The U.S. Department of Labor ("DOL") has noted that a 1% higher level of fees over a 35-year period makes a 28% difference in retirement assets at the end of a participant's career.[2]

23.    Plan participants typically have little appreciation of the fees being assessed to their accounts.  Indeed, according to a 2017 survey conducted by TD Ameritrade, only 27% of investors believed they knew how much they were paying in fees as participants in defined contribution plans, and 37% were unaware that they paid defined contribution fees at all.[3]  It is incumbent upon plan fiduciaries to act for the exclusive best interest of plan participants, protect their retirement

---

[2] *A Look at 401(k) Plan Fees*, UNITED STATES DEPT. OF LABOR at 1-2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resourcecenter/publications/a-look-at-401k-plan-fees.pdf (last visited February 27, 2024).

[3] *See, e.g.*, Ted Godbout, How Much Do 401(k) Participants Know About Their Plan Fees?, American Society of Pension Professionals and Actuaries (Feb. 6, 2018), https://www.asppa.org/news/browse-topics/how-much-do-401k-participants-know-about-their-plan-fees (last visited Feb. 29, 2024).

dollars, and ensure that fees are and remain reasonable for the services provided and properly and fully disclosed.  Unfortunately, fiduciaries of defined contribution retirement plans, including large retirement plans like the Plan, also often lack understanding of the fees being charged to the plans that they administer, manage and control.

### C.   RECORDKEEPING AND ADMINISTRATIVE SERVICES

24.     Fiduciaries of virtually all large defined contribution plans, including the Plan, hire a single provider for the essential recordkeeping and administrative ("RK&A") services for the plan.  These services include, but are not limited to, maintaining plan records, tracking participant account balances and investment elections, and providing transaction processing, call center support, investment education and guidance, participant communications, and trust and custodial services.

25.     The term "recordkeeping" is a catchall term for the entire suite of recordkeeping and administrative services typically provided by a plan's service provider or "recordkeeper."  In other words, recordkeeping fees and RK&A fees are one and the same and the terms are used synonymously.

26.     Recordkeepers typically collect their fees from "direct" compensation and "indirect" compensation.

27.     Direct compensation is paid directly from plan assets and is reflected as a deduction in the value of participant accounts.

28.     Indirect compensation is paid to the recordkeeper indirectly by third parties and is not transparent to retirement plan participants.  These fees are taken from the investment options before the value of the investment option is provided to the participant.  Thus, in most cases, participants are not aware they are paying these fees.  Most indirect compensation is typically collected by recordkeepers through asset-based "revenue sharing."

29.     Virtually all recordkeepers are subsidiaries or affiliates of financial

services and insurance companies that also provide investment options to defined contribution plans (*e.g.*, mutual funds, insurance products, collective trusts, separate accounts, *etc.*) or have some other ancillary line of business (*e.g.*, consulting) to sell to plans. As a result, all recordkeepers consider the economic benefit of their entire relationship with a defined contribution plan when setting fees for their RK&A services. Discounts in a RK&A fee rate are often available based on revenues the recordkeeper earns through the provision of other services (*e.g.*, investment management revenues). In many cases, the additional investment management revenues are more than double or triple the revenue earned by the recordkeeper for providing RK&A services.

30. There are two types of essential recordkeeping services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" arrangement for a buffet-style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis). These services include, but are not limited to, the following:

> i. Recordkeeping;
>
> ii. Transaction processing (including technology to provide participants access to investment options selected by the plan sponsor and to process purchases and sales of participants' assets);
>
> iii. Administrative services related to converting a plan from one recordkeeper to another;
>
> iv. Participant communications (including employee meetings, call centers/phone support, voice response systems, web account access, and the preparation of materials distributed to participants, *e.g.*, summary plan descriptions);
>
> v. Maintenance of an employer stock fund (if needed);

     vi.    Plan document services, including updates to standard plan documents to ensure compliance with new regulatory and legal requirements;

     vii.    Plan consulting services, including assistance in selecting the investment lineup offered to participants;

     viii.    Accounting and audit services, including the preparation of annual reports, *e.g.*, Form 5500s[4] (excluding any separate fees charged by an independent third-party auditor);

     ix.    Compliance support, including assistance interpreting plan provisions and ensuring plan operation complies with legal requirements and plan provisions (excluding separate legal services provided by a third-party law firm); and

     x.    Compliance testing to ensure the plan complies with U.S. Internal Revenue Service nondiscrimination rules.

31.    This suite of essential RK&A services can be referred to as "Bundled RK&A" services.  These services are offered by all recordkeepers for one price (typically at a *per capita* rate), regardless of the services chosen or used by the plan.  Anyone who has passing familiarity with recordkeepers' responses to requests for proposals, bids, and contracts understands and appreciates that the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.  In fact, providers of RK&A services will provide bids for services without knowing details of a plan beyond the number of participant accounts and asset levels in the plan.  Any claim that the pricing of RK&A services depends upon the level of services provided to a plan is both false and frivolous.  Nonetheless, fiduciary-defendants all too often attempt to stave off breach of

---

[4] The Form 5500 is the annual report that defined contribution plans are required to file with the DOL and Department of Treasury pursuant to ERISA reporting requirements.

fiduciary duty claims by disingenuously asserting that the pricing of Bundled RK&A services depends upon service level, even though the marketplace for these services belies such an assertion.

32.     The second type of essential RK&A services all national recordkeepers provide are "A La Carte RK&A" services, for which providers often charge separate, additional fees based on the use of such services by individual participants.  These fees are kept distinct from the Bundled RK&A arrangement to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance.  A La Carte RK&A services typically include, but are not limited to, the following:

          i.     Loan processing;

         ii.     Brokerage services/account maintenance (if offered by the plan);

       iii.     Distribution services; and

       iv.     Processing of qualified domestic relations orders.

33.     All national recordkeepers have the capability to provide all the aforementioned RK&A services to large defined contribution plans, including those much smaller than the Plan.

34.     For large plans with more than 5,000 participants, any minor variations in the way these essential RK&A services are delivered have no material impact on the fees charged by recordkeepers to deliver the services.  Indeed, the industry-wide practice of recordkeepers quoting fees for Bundled RK&A services on a per-participant basis without regard for any individual differences in services requested confirms that recordkeepers view such differences as immaterial and inconsequential from a cost perspective.

35.     While recordkeepers in the defined contribution industry attempt to distinguish themselves through marketing and other means, they all offer the same

bundles and combinations of services.[5]  Accordingly, the market for defined contribution plan RK&A services has become increasingly price competitive, particularly for larger plans, like the Plan, that have a considerable number of participants and significant assets.

36.    The marginal cost of adding an additional participant to a recordkeeping platform is relatively low.  These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans, including the Plan.  As a plan's participant count increases, the recordkeeper's fixed costs of providing RK&A services are spread over a larger population, thereby reducing the average unit cost of delivering services on a per-participant basis.  In other words, because the incremental variable costs for providing RK&A services depend on the number of participants with account balances in a defined contribution plan, the cost to the recordkeeper on a per-participant basis declines as the number of plan participants increases.  As a result, a recordkeeper will accept a lower fee to provide RK&A as the number of participants in the plan increases.

37.    It is axiomatic in the retirement plan services industry that, all else being equal: (1) a plan with more participants can and will receive a lower effective per-participant fee when evaluated on a per-participant basis; and (2) as participant counts increase, the effective per-participant RK&A fee should decrease.

38.    Similarly, the average cost for a recordkeeper to provide services to a participant does not hinge on that participant's account balance.  In other words, it costs a recordkeeper the same amount to provide services to a participant with an account balance of $10,000 as it does to provide services to a participant with a

---

[5] Sarah Holden, James Duvall & Elena Barone Chism, *The Economics of Providing 401(k) Plans: Services, Fees, and Expenses*, ICI Research Perspective 27, No. 6 (June 2021), https://www.ici.org/system/files/2021-06/per27-06.pdf (last visited Feb. 29, 2024) (list of standard services provided to 401(k) plans in Figure 2, at page 2).

balance of $1,000,000.

39.     Informed, prudent plan fiduciaries are aware of these cost structure dynamics and marketplace realities and will leverage the plan's participant count to obtain lower effective per- participant fees.[6]

40.     Since recordkeeping fees are paid in dollars, prudent fiduciaries evaluate the fees for RK&A services on a dollar-per-participant basis.  This is the current standard of care for ERISA fiduciaries and has been throughout the Class Period.

41.     Prudent fiduciaries will regularly ensure that a plan is paying fees commensurate with its size in the marketplace by soliciting competitive bids from recordkeepers other than the plan's current provider.  Recognizing that RK&A services are essentially uniform in nature, and that small differences in the services required by a large plan are immaterial to the cost of providing such services, most recordkeepers only require a plan's participant count and asset level in order to provide a fee quote.  These quotes are typically provided on a per-participant basis, enabling fiduciaries to easily compare quotes on an apples-to-apples basis to determine if the current level of fees being charged by a plan's recordkeeper is reasonable.

42.     Having received quotes, a prudent fiduciary will then negotiate with the plan's current provider for a lower fee or move to a new provider for the same (or better) services at a competitive (or lower) fee.  This is because prudent fiduciaries understand that excessive fees significantly and detrimentally impact the value of participants' retirement accounts.

43.     After negotiating the fee the plan will pay to the recordkeeper, the

---

[6] *See* Defined Contribution Plan Fee Practices, MERCER (2020), https://www.mercer.us/content/dam/mercer/attachments/north-america/us/us-2020-dc-fee-practices.pdf (noting that the costs incurred by recordkeepers "are directly impacted by the number of participants in the plan.").

fiduciaries can allocate the fee among participant accounts at the negotiated per-participant rate, or *pro rata* based on participant account balances, or use a different, less common method.

**D.    DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

44.    Defendants have severely breached their fiduciary duties of prudence and loyalty to the Plan in several ways.  Plaintiff did not acquire actual knowledge of Defendants' breaches until shortly before this Complaint was filed.

**1.    <u>The Plan's Excessive Recordkeeping/Administrative Costs</u>**

45.    An obvious indicator of Defendants' breaches of their fiduciary duties is the Plan's excessive RK&A expenses.  The impact of such high fees on participant balances is aggravated by the effect of compounding, to the significant detriment of participants over time.  This effect is illustrated by the below chart, published by the SEC, showing the 20-year impact on a balance of $100,000 by fees of 25 basis points (0.25%), 50 basis points (0.50%), and 100 basis points (1.00%).



46.    During the Class Period, participants paid Principal for RK&A services indirectly through asset-based charges to their account balances.

47.    The RK&A services provided to the Plan are (and at all times were)

the same standard services identified above and are the same as those provided to comparable plans.  Principal provides no services to the Plan and its participants that are unusual or out of the ordinary.  Regardless, for large plans, like the Plan here, any differences in services are immaterial to pricing considerations, the primary drivers of which are the number of participants and whether fiduciaries employed a competitive process of soliciting bids to determine the reasonable market rate for the services required by the plan.

48.     Since the start of the Class Period, Defendants caused the Plan to pay total amounts of RK&A fees that far exceeded the reasonable market rate. According to the Plan's participant fee disclosures, an annual RK&A expense of 0.125% is applied to each participant's Plan account balance, less any revenue sharing amounts included in the total investment expense of particular Plan investment options.  Any such revenue sharing amounts are credited back to the impacted participant as a fee adjustment and serve to reduce the net effective RK&A expense paid by the impacted participant.  The table below sets forth the annual amounts per participant the Plan ultimately paid to Principal in RK&A fees pursuant to the 0.125% charge, less any applicable revenue sharing identified in the expense ratios of particular investment options in the Plan's participant fee disclosures.  If at any time during the Class Period the RK&A expense rate was greater than 0.125%, the effective per participant fees would be greater than the amounts displayed below.

| | 2018 | 2019 | 2020 | 2021 | 2022 | Average |
|---|---|---|---|---|---|---|
| Participant Accounts with a Balance | 13,095 | 12,586 | 11,500 | 12,037 | 11,822 | 12,208 |
| Net Asset-Based RK&A Fee | $578,196 | $694,922 | $784,190 | $913,829 | $733,054 | 740,838 |
| RK&A Fee ($ per participant) | $44 | $55 | $68 | $76 | $62 | $61 |

49.     Given the Plan's size, expected growth, and resulting negotiating power, with prudent management and administration, the Plan should unquestionably have been able to obtain reasonable rates for RK&A services that were significantly lower than the effective per-participant RK&A rates set forth

above.

50.     While asset-based fee arrangements, such as the 0.125% per participant charge paid by the Plan, are not inherently imprudent, this method of paying fees risks an undue increase in fees as plan assets grow.

51.     According to publicly available data and information from participant fee disclosures and Form 5500 filings of similarly sized defined contribution plans during the Class Period, other comparable plans were paying much lower fees than the Plan throughout the Class Period.  The ability of comparable plans to negotiate lower fees for materially identical services is clear and compelling evidence that the reasonable market rate is lower than the fee the Plan was paying.

52.     Table 1 below lists the RK&A fees paid by 27 similarly sized defined contribution plans to several different national recordkeepers, which represent the prices available to the Plan during the Class Period.  Table 1 also indicates the number of participants and assets of each plan.

| Plan | Participants | RK&A Fee ($) | RK&A Fee ($/pp) | Recordkeeper |
|---|---|---|---|---|
| Komatsu Mining Corp. Retirement Savings Plan | 5,235 | $263,330 | $50 | Fidelity |
| Menasha Corporation 401(k) Retirement Savings Plan | 5,442 | $304,429 | $56 | Prudential |
| Smithfield Foods, Inc. Salaried 401(k) Plan | 6,266 | $295,016 | $47 | Great West |
| Thedacare Retirement and 403(b) Savings Plan | 7,847 | | $43 | Transamerica |
| Bausch Health Companies Inc. Retirement Savings Plan | 8,964 | $338,828 | $37 | Fidelity |
| The Boston Consulting Group, Inc. Employees' Savings Plan and Profit Sharing Retirement Fund | 10,455 | $449,739 | $43 | Vanguard |
| Southern California Permanente Medical Group Tax Savings Retirement Plan | 11,388 | $473,410 | $42 | Vanguard |
| **Advantage 401(k) Savings Plan** | **12,208** | **$740,838** | **$61** | **Principal** |
| Viacom 401(k) Plan | 12,884 | $411,959 | $32 | Great West |
| Fortive Retirement Savings Plan | 13,502 | $472,673 | $35 | Fidelity |
| United Airlines Pilot Retirement Account Plan | 14,042 | | $22 | Schwab |
| DHL Retirement Savings Plan | 14,472 | $483,191 | $33 | Fidelity |
| Michelin 401(k) Savings Plan | 15,880 | $543,332 | $34 | Vanguard |
| Ecolab Savings Plan and ESOP | 17,886 | $608,061 | $34 | Fidelity |
| Qualcomm Incorporated Employee Savings and Retirement Plan | 20,955 | $639,143 | $31 | Fidelity |
| MassMutual Thrift Plan | 23,131 | | $35 | MassMutual |
| The Rite Aid 01(k) Plan | 24,309 | $719,730 | $30 | Great West |
| Sanofi U.S. Group Savings Plan | 25,086 | $567,836 | $23 | T. Rowe Price |
| Dollar General Corp 401(k) Savings and Retirement Plan | 25,614 | $901,634 | $35 | Voya |
| Farmers Group, Inc. 401(k) Savings Plan | 26,826 | | $35 | Vanguard |
| Fidelity National Information Services, Inc. 401(k) Profit Sharing Plan | 27,396 | $958,957 | $35 | Vanguard |
| Philips North America 401(k) Plan | 28,348 | $720,606 | $23 | Prudential |
| Orlando Health, Inc. Retirement Savings Plan 403B | 29,229 | $870,097 | $30 | Fidelity |
| Baptist Health South Florida, Inc. 403(b) Employee Retirement Plan | 29,704 | | $23 | Transamerica |
| Bristol-Myers Squibb Savings and Investment Program | 30,518 | | $32 | Fidelity |
| Chevron Employee Savings Investment Plan | 33,484 | | $26 | Fidelity |
| Danaher Corporation & Subsidiaries Savings Plan | 35,467 | $1,062,204 | $30 | Fidelity |
| Beaumont Health 403(b) Retirement Savings Plan | 36,916 | | $28 | Fidelity |

53.     When the fees in Table 1 are plotted by participant count (as shown in Table 2 below), the resulting graph illustrates the well-established and widely-understood dynamic in the RK&A marketplace that plans with larger participant counts are able to leverage their size to achieve lower relative RK&A fees. National RK&A service providers maintain internal pricing curves that reflect the same dynamic, and they use such pricing curves in preparing bids to plans.



54.     The blue datapoint far above the trendline in Table 2 represents the Plan's average RK&A fee.

55.     The RK&A fees calculated for each comparable plan in Tables 1 and 2 include all the direct and indirect compensation paid to the recordkeeper disclosed on each plan's Form 5500,[7] accounting for Bundled and any A La Carte services. Specifically, if the pricing structure as described in the relevant Form 5500 reveals that some or all revenue sharing is not returned to the plan, then the appropriate amount of revenue sharing is also included to calculate the RK&A fees.  In some cases, the plan's investment options do not provide any revenue sharing, meaning any indirect revenue is immaterial to the RK&A fees.  In other plans, all of the revenue sharing is returned to the plans and is therefore not included in the fee calculation.  The calculated sum of the total RK&A fees that each plan paid to its recordkeeper is then divided by the total number of participants with an account

---

[7] Fee calculations for the comparable plans are based on the information disclosed in each plan's 2020 Form 5500, or the most recently filed Form 5500 if 2020 is not available.

balance in the plan in order to determine the plan's fees on a per-participant basis. For the plans for which no total RK&A fee is provided in Table 1, the per participant fee was sourced directly from publicly available participant fee disclosures.8  Accordingly, no calculation is necessary for these plans.  The foregoing assumptions ensure that the comparison between plans appropriately accounts for any differences in the arrangement or method by which the identified plans pay RK&A fees.

56.     The comparable plans above received at least the same RK&A services as the Plan.  Therefore, the fees shown in Tables 1 and 2 above are apples-to-apples comparisons in that they include all the fees being charged by each recordkeeper to provide the same RK&A services to similar defined contribution plans.

57.     As Tables 1 and 2 above indicate, the fees the Plan paid for a materially identical package of services are much higher than those charged to plans with comparable (and in many cases smaller) participant counts.  Indeed, based on fees paid by these comparator plans during the Class Period, it is more than reasonable to infer that Defendants failed to follow a prudent process to ensure that the Plan was paying only reasonable fees for RK&A services.

58.     Prevailing standards dictate that fiduciaries of large retirement plans regularly evaluate the fees paid out of plan assets (i.e., participant accounts) to ensure that such fees are reasonable at all times.  This entails conducting competitive bidding roughly every three years and appropriate benchmarking during gaps in competitive bidding.  In fact, the DOL formally recognized as early as 2010 that prudent plan fiduciaries normally conduct requests for proposal (the

---

8 While participant fee disclosures for the vast majority of plans are not publicly available, the participant fee disclosures reflected in Tables 1 and 2 plainly validate the pricing curve set forth in Table 2 and confirm that comparable plans were able to achieve vastly lower RK&A fees than the Plan.

most formal type of competitive bidding) every three to five years.  See 75 Fed.
Reg. 41,619 (July 16, 2010).

59.     In light of the fact that the effective RK&A fees paid by Plan
participants grew during the Class Period despite no material change in the services
provided or the number of participants, Defendants clearly engaged in virtually no
examination, comparison, or benchmarking of the RK&A fees of the Plan to those
of other similarly sized defined contribution plans or were complicit in paying
grossly excessive fees.

60.     Defendants' failure to recognize that the Plan and its participants were
grossly overcharged for RK&A services and its failure to take effective remedial
actions amount to a shocking breach of its fiduciary duties to the Plan.  To the
extent Defendants had a process in place, it was imprudent and ineffective given the
objectively unreasonable fees the Plan paid for RK&A services.  Had Defendants
appropriately monitored the compensation paid to Principal and ensured that
participants were only charged reasonable RK&A fees, Plan participants would not
have lost millions of dollars in their retirement savings over the last six-plus years.

## 2.     The Plan's Imprudent Investment Options

61.     The goal of an active manager is to beat a benchmark—usually a
market index or a combination of indices—by taking more risk than the relevant
index or indices.[9]  It is a basic principle of investment theory that the risks

---

[9] *See* Ashley Kilroy, *What Is Active Management and Is It Right For You?*,
SmartAsset Advisor, LLC, February 16, 2023, available at
https://smartasset.com/financial-advisor/active-management, accessed on January
24, 2024 ("[t]he goal of active management is to outperform a specific market
index or, in a market downturn, to book losses that are less severe than a specific
market index suffers"); Lehman and Modest, *Mutual Fund Performance
Evaluation: A Comparison of Benchmarks and Benchmark Comparisons*, Journal of
Finance, Vol. XLII, No. 2, June 1987 (evaluating the performance of benchmarks
using CAPM and APT, and explaining that the entire purpose of actively managed
mutual funds is to exceed the performance of an index/benchmark);  Baks, Metrick,
and Wachter, *Should Investors Avoid All Actively Managed Mutual Funds? A Study*

associated with an investment must be justified by its potential returns in order for that investment to be rational.  This principle applies even before considering the purpose of the investment or the needs of an investor.  The Capital Asset Pricing Model ("CAPM")—which is used to price securities and generate expected returns for assets given their risks and the cost of capital—provides the following mathematical formula for this principle:

$$ERi = Rf + \beta i(Erm - Rf), \text{ where:}$$

$$ERi = \text{the expected return of the investment}$$

$$Rf = \text{the risk-free rate}$$

$$\beta i = \text{the beta of the investment}$$

$$(Erm - Rf) = \text{the market risk premium}$$

62.    Applied here, the beta—$\beta i$—is the risk associated with an actively managed mutual fund or collective trust, which can be justified only if the expected return—$ERi$—is, at the very least, above that of its benchmark, $Rf$.[10]  Otherwise, the model collapses, and it would be imprudent to assume the extra risk without achieving a higher return than the benchmark.

63.    The goal of an active manager is to beat a benchmark—usually a market index or a combination of indices—by taking more risk than the relevant

_in Bayesian Performance Evaluation_, Journal of Finance, Vol. LVI, No. 1, February 2001 (observing that, since Jensen in 1968, "most studies have found that the universe of mutual funds does not outperform its benchmarks after expenses" and "evidence indicates that the average active mutual fund should be avoided"); Jensen, _The Performance of Mutual Funds in the Period 1945-1964_, Vol. XXIII, No. 2, May 1968 (explaining that most actively managed mutual funds do not outperform indexes and that only those that outperform indexes can justify the risk and expense from an economic perspective).

[10] In this instance, the index benchmark takes place of the "risk-free" rate, as the investment option is measured against the performance of that investment category, rather than the typical U.S. Treasury Bonds or equivalent government security in a general CAPM calculation.  The Arbitrage Pricing Theory ("APT") likewise dictates the same result.

index or indices.  Kilroy, *Is Active Management a Good Idea for Your Portfolio* (SmartAsset Advisor, LLC) (December 11, 2019), https://smartasset.com/financial-advisor/active-management ("the goal of active management is to outperform a specific market index or, in a market downturn, to book losses that are less severe than a specific market index suffers"); *see also* Lehman and Modest, *Mutual Fund Performance Evaluation: A Comparison of Benchmarks and Benchmark Comparisons*, Journal of Finance, Vol. XLII, No. 2 (June, 1987) (evaluating the performance of benchmarks using CAPM and Arbitrage Pricing Theory ("APT") and explaining that the entire purpose of actively managed mutual funds is to exceed the performance of an index/benchmark); Baks, Metrick, & Wachter, *Should Investors avoid all actively managed mutual funds?  A Study in Bayesian performance evaluation*, Journal of Finance, Vol. LVI, No. 1 (February, 2001) (observing that, since Jensen in 1968, "most studies have found that the universe of mutual funds does not outperform its benchmarks after expenses" and "evidence indicates that the average active mutual fund should be avoided"); Jensen, *The Performance of Mutual Funds in the Period 1945-1964*, Vol. XXIII, No. 2 (May, 1968) (explaining that most actively managed mutual funds do not outperform indexes and that only those that outperform indexes can justify the risk and expense from an economic perspective).  Thus, any suggestion that a comparison of actively managed funds to passively managed investments (as a proxy for the specific market index that the actively managed investment attempts to beat) is somehow inappropriate or an "apples to oranges" comparison in every instance ignores the fundamental purpose and design of active mutual funds and is inconsistent with basic investment theory and the prevailing frameworks employed by prudent fiduciaries.

64.    Indeed, prudent fiduciaries should compare actively managed funds to passively managed funds or similar indices in order to determine whether a plan is getting the additional return to justify the increased expense and risk of the active

investment. This, in addition to other metrics (such as peer relative performance), is exactly what every minimally competent investment professional does to evaluate an actively managed investment and arguments or suggestions to the contrary fall far outside mainstream thought in terms of investment management, basic economics and minimum standards of fiduciary care and prudence. Indeed, in promulgating its Final Rule to Improve Transparency of Fees and Expenses to Workers in 401(k)-Type Retirement Plans in February, 2012, the DOL specifically required that plan sponsors identify benchmarks in the form of an appropriate broad-based securities market index for each investment offered in the plan, thus specifically recognizing that actively managed investments must be evaluated against indexes, for which passively managed index funds serve as an investable proxy. Performing such a comparative analysis is not merely intended to determine whether a plan would be better served by a passively managed investment, but rather whether an actively managed fund is providing value sufficient to justify its retention.

65.     Market research has indicated that investors should be skeptical of certain actively managed funds' ability to consistently outperform their indices, which is a significant concern for long-term investors saving for retirement, like Plan participants and beneficiaries. Indeed, Morningstar has repeatedly concluded that "in general, actively managed funds have failed to survive and beat their benchmarks, especially over longer time horizons."[11]  Although they may

---

[11] Ben Johnson, *How Actively and Passively Managed Funds Performed: Year-End 2018*, MORNINGSTAR (Feb. 12, 2019), www.morningstar.com/insights/2019/02/12/active-passive-funds. *See also* Kilroy, Is Active Management a Good Idea for Your Portfolio (SmartAsset Advisor, LLC) (December 11, 2019), https://smartasset.com/financial-advisor/active-management (there is controversy around the performance of active managers and if they produce superior returns. In fact, over the past 15 years, 92.43% of large-cap managers, 95.13% of mid-cap managers, 97.70% of small-cap managers failed to surpass their benchmark index. Also, over three years, active managers

experience success over shorter periods, active fund managers are infrequently able to time their activity efficiently enough to outperform the market. This is not to suggest that active management is inappropriate for use in a retirement plan lineup, but that plan fiduciaries must carefully analyze each active fund's ability to provide value and, if they deem a fund does not, replace it with an active or passive fund that has demonstrated such capabilities.

66.    In this environment, prudent fiduciaries scrutinize investment managers to determine whether an active manager has presented an ability to exploit inefficiencies in their chosen sector of the market. To do so and distinguish between a skilled manager and a lucky one, fiduciaries judge fund performance against both an appropriate index benchmark and a universe of similar funds over periods most closely approximating a market cycle—namely, three- and five-year intervals. These time horizons are emphasized by virtually all competent investment professionals as sufficient to gauge a fund manager's ability to execute their strategy. In addition, these two specific time horizons (three- and five-year trailing performance) are the specific timeframes that almost all investment policy statements identify as the most important to review in connection with review of 401(k) investments.[12]

_____

underperformed the market by 0.36%.)

[12] Although it may be tempting to somewhat simplistically suggest that 10-year performance, for example, is more important since the plans at issue are retirement plans, any such suggestion is eschewed by competent and principled investment professionals for several important reasons: (1) waiting for 10 years to determine whether the performance of an investment is acceptable is simply too long because losses that can accrue over such a prolonged period can be devastating to an investor and are almost always unrecoverable in nature; (2) in light of labor market flexibility in the United States (with the average employee holding a position for slightly more than four years, *i.e.* between three and five years), the average participant does not remain invested in the same 401(k) plan or retirement instruments for as long as 10 years, *see* Department of Labor, Bureau of Labor Statistics News Release: Employee Tenure in 2022 (September 22, 2022),

67.     A prudent investment monitoring process will regularly review fund performance against a relevant index and peer group for the most recent calendar quarter end over the previous three- and five-year periods, as well as several preceding three- and five-year periods, in order to discern any pattern of underperformance.  Through this lens, if a fund exhibits a persistent inability to both exceed the returns of its market index and rank in the top 50 percent among its peers, prudent fiduciaries perform a detailed review of the fund and investigate potential replacements.[13]

i.     **The Franklin Growth Fund**

68.     The Franklin Growth Fund R6 ("Franklin Fund" or "Fund") was retained as a Plan investment option despite an inability to support an expectation of performance sufficient to justify its retention, including as evidenced by its consistent and significant underperformance relative to its benchmark, the Russell 1000 Growth Index, and its peer group, as represented by the Morningstar US Large Growth category.  However, due to the Committee's investment review procedures, a general lack of understanding of how to evaluate investment returns, and/or a general attitude of neglect toward the Plan, Defendants failed to appropriately scrutinize, and ultimately replace the investment.  The below

---

https://www.bls.gov/news.release/pdf/tenure.pdf; and (3) the average market cycle is less than 10 years and, therefore, as a matter of investment theory and management, it is not the most important or meaningful benchmark with respect to performance.

[13] The degree of cumulative underperformance that prudent fiduciaries consider to be material varies by investment type and asset class. For example, the underperformance that a large cap fund experiences before such underperformance is material is not the same degree of underperformance that a real estate fund or foreign investment fund experiences before such underperformance is material.  As explained below, the degree of underperformance experienced by the challenged investment was material and should have prompted Defendants to investigate and remove the funds.

performance data represent information that was easily accessible to the Committee during the Class Period and would have been reviewed by prudent fiduciaries.

69.     By the start of the Class Period, as of the end of the First Quarter of 2018, the Franklin Growth Fund's three-year returns had trailed those of the benchmark for **nine of the last ten quarters**, while the Fund's five-year returns had lagged the benchmark for **all of the previous ten consecutive quarters**.  The prevailing standard of care for investment monitoring demands awareness and consideration of *rolling* performance to identify trends of out- or underperformance. Underperformance over a three- or five-year period is a cause for concern and scrutiny and can itself be reason to remove an investment from a plan.  In any event, prudent fiduciaries will seek to understand the reasons for the underperformance and closely monitor the investment to see if it subsequently outperforms.[14]  Underperformance over several consecutive three- or five-year trailing periods is a cause for both alarm and action.

70.     As discussed above, active managers face an uphill battle to provide value by consistently beating their benchmarks and compensating for fees higher than those funds that simply track the benchmark.  The domestic large cap space is particularly difficult: Morningstar concluded in its year-end 2018 report on active versus passive management that long term success rates (a fund's ability to survive and outperform a low-cost index fund tracking its benchmark over longer time horizons) were lowest among U.S. large cap funds.  A fiduciary prudently evaluating the Franklin Fund at the start of the Class Period would have noted its persistent inability to add value in excess of the benchmark.  Such underperformance relative to the market segment in which the Franklin Fund

---

[14] It should be noted that "improved" or lessening underperformance over time is still just that: underperformance.  A fund manager that persistently fails to outperform, however great or slight the underperformance, persistently fails to add value.

operates persisted through the remainder of the Class Period; by the First Quarter of 2019, the Franklin Fund was similarly underperforming its peers.  The Franklin Fund's repeated failure to generate long-term returns that exceeded the benchmark alone should have been sufficient to convince a fiduciary prudently monitoring its performance to remove the troubled investment; that the fund was retained by the Committee despite concurrently failing to rank in the top half of all large cap growth funds represents a severe and inexplicable breach of fiduciary duty.

71.     Had the Committee met to appropriately review the Plan's investment results as of the end of the First Quarter of 2019, it would have noted that the Franklin Fund's three-year return ranked in the 56th percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by 0.93% annualized, while the Fund's five-year return ranked in the 46th percentile among peers and trailed the benchmark return by 1.18% annualized.

72.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Second Quarter of 2019, it would have noted that the Franklin Fund's three-year return ranked in the 51st percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by 0.73% annualized, while the Fund's five-year return ranked in the 44th percentile among peers and trailed the benchmark return by 0.85% annualized.

73.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Third Quarter of 2019, it would have noted that the Franklin Fund's three-year return ranked in the 51st percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by 1.54% annualized, while the Fund's five-year return ranked in the 39th percentile among peers and trailed the benchmark return by 1.00% annualized.

74.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Fourth Quarter of 2019, it would have noted that the Franklin Fund's three-year return ranked in the 62nd percentile among large growth

funds and trailed the return of the Russell 1000 Growth Index by 2.61% annualized, while the Fund's five-year return ranked in the 50th percentile among peers and trailed the benchmark return by 1.84% annualized.

75.     At this point, had it engaged in an appropriate ongoing review of the Franklin Fund, the Committee would have been aware as of its meeting following the Fourth Quarter of 2019 of the Fund's performance shortcomings against the benchmark, which stretched back several years on both a three- and five-year basis, and relative to peers over the four most recent quarters on a three-year basis.  The foregoing trend represented compelling information requiring a serious and deliberate decision as to whether there was any basis to retain the Franklin Fund, as sustained underperformance is the clearest indication of a manager's inability to provide value.  However, Defendants ignored or were otherwise unaware of the troubling pattern of rolling returns, failed to investigate a replacement for the Franklin Fund, and allowed it to linger even as its performance issues persisted, and worsened.

76.     Had the Committee met to appropriately review the Plan's investment results as of the end of the First Quarter of 2020, it would have noted that the Franklin Fund's three-year return ranked in the 65th percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by *3.07%* annualized, while the Fund's five-year return ranked in the 53rd percentile among peers and trailed the benchmark return by *2.19%* annualized.

77.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Second Quarter of 2020, it would have noted that the Franklin Fund's three-year return ranked in the 71st percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by *4.62%* annualized, while the Fund's five-year return ranked in the 61st percentile among peers and trailed the benchmark return by **2.96%** annualized.

78.     Had the Committee met to appropriately review the Plan's investment

results as of the end of the Third Quarter of 2020, it would have noted that the Franklin Fund's three-year return ranked in the 70th percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by *5.10%* annualized, while the Fund's five-year return ranked in the 61st percentile among peers and trailed the benchmark return by *3.26%* annualized.

79.     Had the Committee met to appropriately review the Plan's investment results as of the end of the Fourth Quarter of 2020, it would have noted that the Franklin Growth Fund's three-year return ranked in the 66th percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by *3.98%* annualized, while the Fund's five-year return ranked in the 52nd percentile among peers and trailed the benchmark return by *2.50%* annualized.

80.     At this point, consistent with their regular monitoring duties, the Committee should have been aware of the Franklin Fund's dismal trend: *sixteen straight quarters* of three-year underperformance versus the benchmark, *twenty-one straight quarters* of five-year underperformance versus the benchmark, *eight consecutive quarters* of three-year returns that ranked in the bottom half of large cap growth funds, and *four consecutive quarters* of five-year returns that ranked in the bottom half of large cap growth funds.  Such blatant indicators of the imprudence of the continued retention of the Franklin Fund should have been sufficient to convince Defendants to investigate a replacement but were inexplicably ignored.

81.     Had the Committee met to appropriately review the Plan's investment results as of the end of the First Quarter of 2021, it would have noted that the Franklin Growth Fund's three-year return ranked in the 66th percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by *3.77%* annualized, while the Fund's five-year return ranked in the 59th percentile among peers and trailed the benchmark return by *2.15%* annualized.

82.     Had the Committee met to appropriately review the Plan's investment

results as of the end of the Second Quarter of 2021, it would have noted that the Franklin Fund's three-year return ranked in the 61st percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by *3.54%* annualized, while the Fund's five-year return ranked in the 63rd percentile among peers and trailed the benchmark return by *2.87%* annualized.

83.    Had the Committee met to appropriately review the Plan's investment results as of the end of the Third Quarter of 2021, it would have noted that the Franklin Growth Fund's three-year return ranked in the 66th percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by *3.63%* annualized, while the Fund's five-year return ranked in the 63rd percentile among peers and trailed the benchmark return by *3.27%* annualized.

84.    Had the Committee met to appropriately review the Plan's investment results as of the end of the Fourth Quarter of 2021, it would have noted that the Franklin Fund's three-year return ranked in the 63rd percentile among large growth funds and trailed the return of the Russell 1000 Growth Index by *5.52%* annualized, while the Fund's five-year return ranked in the 65th percentile among peers and trailed the benchmark return by *4.05%* annualized.

85.    At this point, with the Franklin Growth Fund's miserable long-term performance having continued unabated for another four quarters, consistent with their regular monitoring duties, the Committee should have been aware of the Fund's ***twenty straight quarters*** of three-year underperformance versus the benchmark, ***twenty-five straight quarters*** of five-year underperformance versus the benchmark, ***twelve consecutive quarters*** of three-year returns that ranked in the bottom half of large cap growth funds, and ***eight consecutive quarters*** of five-year returns that ranked in the bottom half of large cap growth funds.  This deplorable performance has endured through the filing of this Complaint.

86.    As is clearly exhibited by the weak performance shown above, Franklin Fund has never been an appropriate investment option for the Plan.  When

an investment option's track record is so poor, as is apparent here, Defendants should necessarily replace the fund in the Plan with an alternative that has demonstrated the ability to consistently outperform the benchmark and regularly rank in the top half of similar investment strategies, or, at the very least, in such an efficient segment of the market, retain an alternative that tracks the benchmark. While the low-cost Russell 1000 Growth Index Fund I offered by Vanguard provided investors the opportunity to track the returns of the Russell 1000 Growth Index for the duration of the Class Period, alternative actively managed large cap growth funds like the Fidelity Growth Company Fund K ("Fidelity Fund") and JPMorgan Large Cap Growth Fund R6 ("JPMorgan Fund") provided investors with consistent added value: from the First Quarter of 2018 through the Fourth Quarter of 2023, the three-year returns of the Fidelity Fund ranked lower than the top *quartile* just twice, and similarly trailed the benchmark just twice, while its five-year returns never ranked lower than the 12th percentile and never trailed the benchmark; over the same 24-quarter period, the three-year returns of the JPMorgan Fund ranked outside the top *quartile* just three times and trailed the benchmark just four times, while its five-year returns never ranked lower than the 18th percentile and trailed the benchmark just once.  At all relevant times the three- and five-year returns of the Fidelity and JPMorgan Funds ranked in the top half of their peer group.

87. Despite transparent and persistent red flags and the availability of investment options that provided the benchmark returns at low cost, as well as several prudent alternative actively managed large cap growth options, Defendants failed to appropriately monitor the Franklin Fund throughout the Class Period and neglected to replace the underachieving investment option in a severe breach of fiduciary duty.

## V. ERISA'S FIDUCIARY STANDARDS

88. ERISA imposes strict fiduciary duties of prudence and loyalty on the

Defendants as fiduciaries of the Plan.  Section 404(a) of ERISA, 29 U.S.C. §

1104(a), states, in relevant part, as follows:

> [A] fiduciary shall discharge his duties with respect to a plan solely in
> the interest of the participants and beneficiaries and—
>
> (A)    for the exclusive purpose of:
>
> (i)    providing benefits to participants and their
> beneficiaries; and
>
> (ii)   defraying reasonable expenses of administering the
> plan;
>
> [and]
>
> (B)    with the care, skill, prudence, and diligence under the
> circumstances then prevailing that a prudent man acting in
> a like capacity and familiar with such matters would use in
> the conduct of an enterprise of like character and with like
> aims.

89.    Under 29 U.S.C. § 1103(c)(l), as relevant here, the assets of a plan

shall never inure to the benefit of any employer and shall be held for the exclusive

purposes of providing benefits to plan participants and their beneficiaries and

defraying reasonable expenses of administering the plan.

90.    Under ERISA, parties that exercise any authority or control over plan

assets, including the selection of plan investments and service providers, are

fiduciaries and must act prudently and solely in the interest of participants in a plan.

91.    ERISA's fiduciary duties are "the highest known to the law" and must

be performed "with an eye single" to the interests of participants.  *Howard*, 100

F.3d at 1888 (citing *Donovan*, 680 F.3d at 272 n.8).

92.    ERISA also imposes explicit co-fiduciary liabilities on plan

fiduciaries.  Section 405(a) of ERISA, 29 U.S.C. § 1105(a), provides a cause of

action against a fiduciary for knowingly participating in a breach by another

fiduciary and knowingly failing to cure any breach of duty. Specifically, Section 405(a) of ERISA states:

> In addition to any liability which he may have under any other provision of this part, a fiduciary with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan in the following circumstances:
>
> (1) if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such act or omission is a breach; or
>
> (2) if, by his failure to comply with section 404(a)(l) in the administration of his specific responsibilities which give risk to his status as a fiduciary, he has enabled such other fiduciary to commit a breach; or
>
> (3) if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach.

93.     Section 502(a)(2) of ERISA, 29 U.S.C. § 1132(a)(2) authorizes a plan participant to bring a civil action to enforce a breaching fiduciary's liability to the plan under Section 409, 29 U.S.C. § 1109. Section 409(a) of ERISA states, in relevant part:

> Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

1

## VI.   CLASS ALLEGATIONS

2     88.    This Action is brought as a class action by Plaintiff on behalf of herself

3  and the following proposed Class:

4          All participants and beneficiaries in the Advantage
5          401(k) Savings Plan at any time on or after March 4,
           2018, and continuing to the date of judgment, or such earlier
6          date that the Court determines is appropriate and just.

7        Excluded from the Class are Defendants and the Judge to whom this case is

8  assigned or any other judicial officer having responsibility for this case.

9     89.    This action may be maintained as a class action pursuant to Rule 23 of

10  the Federal Rules of Civil Procedure.

11     90.    **Numerosity.**  Plaintiff is informed and believes that there are at least

12  thousands of Class members throughout the United States.  As a result, the

13  members of the Class are so numerous that their individual joinder in this action is

14  impracticable.

15     91.    **Commonality.**  There are numerous questions of fact and/or law that

16  are common to Plaintiff and all members of the Class, including the following:

17          (1)    Whether Defendants failed and continue to fail to discharge
18                 their duties with respect to the Plan solely in the interest of
19                 the Plan's participants for the exclusive purpose of
20                 providing benefits to participants and their beneficiaries;

21          (2)    Whether Defendants breached their fiduciary duties under
22                 ERISA by failing to defray reasonable expenses of
23                 administering the Plan; and

24          (3)    Whether and what form of relief should be afforded to
25                 Plaintiff and the Class.

26     92.    **Typicality.**  Plaintiff, who is a member of the Class, has claims that

27  are typical of all members of the Class.  Plaintiff's claims and all Class members'

28

claims arise out of the same uniform course of conduct by Defendants and arise under the same legal theories applicable to all other members of the Class.  In addition, Plaintiff seeks relief for the Plan under the same remedial theories that are applicable to all Class members.

93.     **Adequacy of Representation.**  Plaintiff will fairly and adequately represent the interests of all Class members.  Plaintiff has no conflicts of interest with other Class members and no interests that are different from any other Class other members.  Plaintiff has retained competent counsel experienced in class action and other complex litigation, including ERISA class actions.

94.     **Potential Risks and Effects of Separate Actions.**  The prosecution of separate actions by individual Class members would create a risk of: (1) inconsistent or varying adjudications for individual Class members that would establish incompatible standards of conduct for Defendants; or (2) adjudications with respect to individual Class members that, as a practical matter, would be dispositive of the interests of other Class members not parties to the individual adjudications or would substantially impair or would substantially impair or impede their ability to protect their interests.

95.     **Predominance.**  Common questions of law and fact predominate over questions affecting only individual Class members, and the Court and the parties will spend the vast majority of their time working to resolve these common issues.  Indeed, virtually the only individual issues of significance will be the exact amount of damages recovered by each Class member, the calculation of which will ultimately be a ministerial act and which does not bar Class certification.

96.     **Superiority.**  A class action is superior to all other feasible alternatives for the resolution of this matter.  The vast majority of, if not all, Class members are unaware of Defendants' breaches of fiduciary duty and prohibited transactions such that they will never bring suit individually.  Further, even if they were aware of the claims they have against Defendants, the claims of virtually all Class members

would be too small to economically justify individual litigation.  Finally, individual litigation of multiple cases would be highly inefficient, a gross waste of the resources of the courts and the parties, and potentially could lead to inconsistent results that would be contrary to the interests of justice.

97.    **Manageability.**  This case is well-suited for treatment as a class action and easily can be managed as a class action since evidence of both liability and damages can be adduced, and proof of liability and damages can be presented, on a Class-wide basis, while the allocation and distribution of damages to Class members would be essentially a ministerial function.

98.    Defendants have acted on grounds generally applicable to the Class by uniformly subjecting them to the breaches of fiduciary duty described above. Accordingly, injunctive relief, as well as legal and/or equitable monetary relief (such as disgorgement and/or restitution), along with corresponding declaratory relief, are appropriate with respect to the Class as a whole.

99.    Plaintiff's counsel will fairly and adequately represent the interests of the Class and are best able to represent the interests of the Class under Rule 23(g) of the Federal Rules of Civil Procedure.  Moreover, treating this case as a class action is superior to proceeding on an individual basis, and there will be no difficulty in managing this case as a class action.

100.   Therefore, this action should be certified as a class action under Rules 23(a), and 23(b)(1), or 23(b)(3) of the Federal Rules of Civil Procedure.

## <u>COUNT I</u>
### (For Breaches of Fiduciary Duty Against All Defendants)

101.   Plaintiff incorporates by reference the allegations in the previous paragraphs.

102.   Defendants' conduct, as set forth above, violates their fiduciary duties under Sections 404(a)(1)(A), (B), and (D) of ERISA, 29 U.S.C. § 1104(a)(1)(A),

(B), and (D), in that Defendants failed and continue to fail to discharge their duties with respect to the Plan solely in the interest of the Plan's participants and beneficiaries and: (A) for the exclusive purpose of (i) providing benefits to participants and their beneficiaries, and (ii) defraying reasonable expenses of administering the Plan; (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims; and (C) by failing to act in accordance with the documents and instruments governing the Plan.  In addition, as set forth above, Defendants violated their respective fiduciary duties under ERISA to monitor other fiduciaries of the Plan in the performance of their duties.

103.    To the extent any Defendant did not directly commit any breach of fiduciary duty, at the very minimum, each such Defendant is liable under 29 U.S.C. § 1105(a) because he, she, they, or it was a co-fiduciary and knowingly participated in, or concealed, a breach of fiduciary duty by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of his, her, their, or its specific responsibilities giving rise to his, her, their, or its fiduciary status, or knowingly failed to cure a breach of fiduciary duty by another fiduciary and failed to take reasonable efforts to remedy the breach.

104.    As a direct result of Defendants' breaches of fiduciary duties, the Plan has suffered losses and damages.

105.    Pursuant to Sections 409 and 502(a)(2) of ERISA, 29 U.S.C. §§ 1109 and 1132, Defendants are liable to restore to the Plan the losses that have been suffered as a direct result of Defendants' breaches of fiduciary duty and are liable for damages and any other available equitable or remedial relief, including prospective injunctive and declaratory relief, and attorneys' fees, costs, and other recoverable expenses of litigation.

**<u>COUNT II</u>**
**(Failure to Monitor Fiduciaries and Co-Fiduciary Breaches**
**Against Advantage and the Board)**

106.    Plaintiff incorporates by reference the allegations in the previous paragraphs.

107.    Advantage, acting through the Board, is responsible for appointing, overseeing, and removing members of the Administrative Committee, who, in turn, are responsible for appointing, overseeing, and removing members of the Committee.

108.    In light of its appointment and supervisory authority, Advantage and the Board had a fiduciary duty to monitor the performance of the Administrative Committee and its members.  Advantage, the Board, and the Administrative Committee as a whole also had a fiduciary duty to monitor the performance of the members of the Committee.

109.    A monitoring fiduciary must ensure that the monitored fiduciaries perform their fiduciary obligations, including those related to the investment and holding of Plan assets, and must take prompt and effective action to protect the Plan and its participants when the monitored fiduciaries do not perform their fiduciary obligations.

110.    To the extent that any fiduciary monitoring responsibilities of Advantage, the Board, or the Administrative Committee were delegated, each Defendant's monitoring duty included an obligation to ensure that any delegated tasks were being performed prudently and loyally.

111.    Advantage, the Board, and the Administrative Committee breached their fiduciary monitoring duties by:

>           (1)    Failing to monitor and evaluate the performance of their appointees or have a system in place for doing so, standing idly by as the Plan suffered enormous losses due to the

appointees' imprudent actions and omissions related to the Plan;

(2)   Failing to monitor their appointees' fiduciary processes, which would have alerted a prudent fiduciary to the breaches of fiduciary duties described herein, in clear violation of ERISA; and

(3)   Failing to remove appointees whose performances were inadequate in that they continued to maintain imprudent and poorly performing investments and excessively costs fee arrangements in the Plan, all to the detriment of the Plan and its participants' retirement savings.

112.   As a consequence of these breaches of fiduciary duties to monitor, the Plan suffered substantial losses.  If Advantage, the Board, and the Administrative Committee had discharged their fiduciary monitoring duties prudently, the losses suffered by the Plan would have been avoided or minimized.  Therefore, as a direct result of the breaches of fiduciary duties alleged herein, the Plan and its participants lost millions of dollars in retirement savings.

113.   Advantage, the Board, and the Administrative Committee are liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of fiduciary duties alleged in this Count, to restore to the Plan any profits made through use of Plan assets, and are subject to other equitable or remedial relief as appropriate.

114.   Each Defendant also knowingly participated in the breaches of fiduciary duties by the other Defendants, knowing that such acts constituted breaches; enabled the other Defendants to commit breaches of fiduciary duties by failing to lawfully discharge their own fiduciary duties; and knew of the breaches of fiduciary duties by the other fiduciaries and failed to make any reasonable effort under the circumstances to remedy those breaches.  Defendants are thus liable for

the losses caused by the breaches of their co-fiduciaries under 29 U.S.C. § 1105(a).

## COUNT III

### (In the Alternative, Liability for Knowing Breach of Trust Against All Defendants)

115.   Plaintiff incorporates by reference the allegations in the previous paragraphs.

116.   In the alternative, to the extent that any Defendant is not deemed to be a fiduciary or co-fiduciary under ERISA, each such Defendant should be enjoined or otherwise subject to equitable relief as a non-fiduciary from further participating in a knowing breach of trust.

117.   To the extent any Defendant is not deemed to be a fiduciary or is not deemed to be acting as a fiduciary for any and all applicable purposes, any such Defendant is liable for the conduct at issue here, since all Defendants possessed the requisite knowledge and information to avoid the fiduciary breaches at issue here and knowingly participated in these breaches of fiduciary duty by permitting the Plan to offer a menu of imprudent investment options and pay excessive recordkeeping and administrative fees, all of which was unjustifiable in light of the size and characteristics of the Plan.

## PRAYER FOR RELIEF

118.   WHEREFORE, Plaintiff, on behalf of herself, the Plan, and the Class, demands judgment against Defendants for the following relief:

(1)   Declaratory and injunctive relief under Section 502 of ERISA, 29 U.S.C. § 1132, as detailed above;

(2)   Equitable, legal, or remedial relief to return all losses to the Plan and/or for restitution and/or damages as stated above, plus all other equitable or remedial relief as the Court may deem appropriate under Sections 409 and 502 of ERISA, 29 U.S.C. §§ 1109 and 1132;

(3)   Pre-judgment and post-judgment interest at the maximum permissible rates, whether at law or in equity;

(4)   Attorneys' fees, costs, and other recoverable expenses of litigation; and

(5)   Such further and additional relief to which the Plan may be justly entitled and the Court deems appropriate and just under all of the circumstances.

## NOTICE PURSUANT TO ERISA § 502(h)

To ensure compliance with the requirements of Section 502(h) of ERISA, 29 U.S.C. § 1132(h), the undersigned affirms that, on this date, a true and correct copy of this Complaint was served upon the Secretary of Labor and the Secretary of the Treasury by certified mail, return receipt requested.

Dated: March 4, 2024

Respectfully submitted,

*/s/ James C. Shah*
James C. Shah
MILLER SHAH LLP
19712 MacArthur Blvd., Suite 222
Irvine, CA 92612
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jcshah@millershah.com

James E. Miller
Laurie Rubinow
MILLER SHAH LLP
65 Main Street
Chester, CT 06412
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: jemiller@millershah.com
       lrubinow@millershah.com

Alec J. Berin
MILLER SHAH LLP
1845 Walnut Street, Suite 806
Philadelphia, PA 19103
Telephone: (866) 540-5505
Facsimile: (866) 300-7367
Email: ajberin@millershah.com

Don Bivens
DON BIVENS PLLC
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450
Email: don@donbivens.com

*Attorneys for Plaintiff, the Plan,
and the Proposed Class*